IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

CONSTRUCTION CONTRACTORS
EMPLOYER GROUP, LLC,

                              Plaintiff,                    Case No. 3:14 CV 1468

                -vs-
                                                           MEMORANDUM  OPINION
FEDERAL INSURANCE COMPANY,
et al.,

                              Defendants.

KATZ, J.

        Construction Contractors Employer Group, LLC sued Federal Insurance Company in this

diversity of citizenship action seeking a declaratory judgment and monetary damages regarding an

insurance policy Construction Contractors had purchased.  The parties have made cross-motions

for summary judgment.  (Doc. Nos. 25, 27).  Each party has filed their respective responses (Doc.

Nos. 28, 29), and replies.  (Doc. Nos. 30, 31).

I.  Jurisdiction and Venue

        The Court finds that it has jurisdiction over this action pursuant to 28 U.S.C. § 1332.

Venue is also properly before this Court.  *See* 28 U.S.C. § 1391; N.D. Ohio R. 3.8.

II.  Facts

        The following facts are undisputed.  Associated General Contractors of Northwest Ohio is a

non-profit corporation which is a trade organization for commercial construction contractors

located in Northwest Ohio.  In December 2001, Associated General formed Construction

Contractors as a subsidiary.  Construction Contractors is an employer organization which groups

regional construction employers together for economic reasons regarding various employment

functions, including payroll and tax administration, and to self-insure workers' compensation

obligations.  Construction Contractors had "subscribers" who would transfer funds to Construction Contractors's accounts equal to their gross payroll, plus an additional amount necessary to cover taxes, benefits, and administrative costs.  Construction Contractors would then disburse the money to satisfy the subscribers' payroll and tax obligations.

In April 2002, Construction Contractors hired AlphaCare Services, Inc. to manage the daily operations of the company.  AlphaCare was owned by William H. Cook, III, Gerald L. Tillman, and third-party defendant John E. Moon.  AlphaCare was created for the sole purpose of serving Construction Contractors.  In fact, Construction Contractors was AlphaCare's only client.

Under the agreement between Construction Contractors and AlphaCare, one of the duties of AlphaCare was to manage the payroll of Construction Contractors's subscribers.  AlphaCare would issue payroll checks to the subscribers' employees.

In early July 2012, Kevin Smith, Construction Contractors's President, learned from Moon that Construction Contractors did not have enough money to meet its obligations, including payroll, even though Construction Contractors's subscribers had provided the appropriate amount of funds to cover those costs.  At a follow-up meeting with Smith, Moon indicated that Construction Contractors had substantial tax liabilities and that he had been falsifying Construction Contractors's financial statements.

On July 31, 2012, Construction Contractors terminated its agreement with AlphaCare, hired certain AlphaCare employees to maintain continuity of operations, and initiated an investigation.  As part of that investigation, Construction Contractors retained Peter VanDenBerghe to perform forensic accounting services of Construction Contractors's accounts.

2

As a result of the investigation, Construction Contractors learned that a substantial amount of money was missing.  The investigation revealed that the Internal Revenue Service began levying its accounts in 2011.  The levies became known in July 2012 when the IRS executed an additional $470,000 levy.  The IRS's July 20, 2012 Notice of Levy showed that, as of that date, Construction Contractors owed more than $1.25 million in federal taxes, exclusive of penalties, which had been accumulating since 2005.

The deficits, however, did not stop with the IRS.  VanDenBerghe stated on March 5, 2013, "In addition to the unpaid federal taxes of approximately $900,000, in October 2012, we became aware that [AlphaCare] had failed to remit our Ohio unemployment taxes for the 1st quarter of 2012.  The unpaid unemployment tax amount is approximately $715,000."

VanDenBerghe suspected Moon was responsible for Construction Contractors's tax problems because Moon was the individual responsibility for the remitting and reporting of taxes.  By the time VanDenBerghe started his investigation, Construction Contractors knew that it had lost millions of dollars.  The exact amount, however, was still unknown.

In October 2012, VanDenBerghe discovered that between May 15, 2009, and June 2012, Moon had electronically transferred over $900,000 from a Construction Contractors's account to an AlphaCare's account.  The transfers all came from the same Construction Contractors account and went into the same AlphaCare account.  By November 2012, Construction Contractors had discovered that Moon had placed over $30,000 worth of healthcare premiums and health savings account deposits for AlphaCare's employees "in Construction Contractors's expenses."

As of December 31, 2012, Construction Contractors's balance sheet showed an equity deficit of $2.19 million.  Construction Contractors also knew that Moon's wire fraud and

misallocation of healthcare expenses accounted for less than $1 million of the $2.19 million deficit. VanDenBerghe conceded that the deficit could have been the result of additional misappropriations by Moon. VanDenBerghe further admitted that he never rejected the idea that Moon could have stolen additional funds.

In May 2013, VanDenBerghe discovered that starting in 2002, Moon had stolen over $1 million in checks written to Construction Contractors by a subscriber. To accomplish this theft, Moon would identify Construction Contractors as the customer, but used AlphaCare's account number instead of Construction Contractors's account number.

Moon's check theft scheme ran until April 24, 2009, just three weeks before he began his wire fraud scheme on May 15, 2009. Moon used the funds from the same subscriber to perpetrate his wire and check theft schemes. The AlphaCare account which Moon used for his check theft scheme was the same account that he used for his wire fraud actions. Thus, from 2002 through April 2009, Moon simply deposited the subscriber's checks directly into AlphaCare's account, and from May 2009 through June 2012, he deposited the subscriber's checks into Construction Contractors's account, but then moved the funds to AlphaCare's account. Between the check thefts and wire fraud transactions, Moon misappropriated over $2 million from Construction Contractors.

On or about January 10, 2013, months after learning of the wire fraud transactions, and while the investigation continued into the reasons for the company's substantial negative equity balance, Construction Contractors submitted an application to Federal Insurance for a crime coverage insurance policy. The application form instructed Construction Contractors to "attach a list of all employee theft, forgery, computer fraud or other crime losses discovered by

4

[Construction Contractors] in the last five years, itemizing each loss separately," and to "[i]nclude date of loss, description and total amount of loss."  Construction Contractors did attach a supplement to its application which stated:

> **Item IV. D. 5.** – Since 2002, the CCEG was in contract with AlphaCare Services, Inc. (ACS) to provide specific management duties for the CCEG.  Those duties included the direct management of the corporate bookkeeping and payroll processing.  Effective July 31, 2012, CCEG terminated its contract with ACS for breach of contract.  ACS was contractually responsible for processing our participants' payroll and remitting payroll taxes to the proper taxing authorities.  A subsequent review of ACS' performance has indicated their failure to report, reconcile and remit certain payroll taxes.
>
> A subsequent review of the CCEG's accounting records indicated unauthorized transfers from CCEG owned accounts to ACS owned accounts from 2009 to 2012. Further investigation is in process, and the potential for criminal prosecution is being evaluated by our company attorneys.

Federal Insurance issued Construction Contractors insurance policy number 8234-7801, which contained a Crime Coverage Provision.  The policy was for a period of March 22, 2013, through July 1, 2013, providing up to $1 million in protection for covered losses.

Construction Contractors also purchased the "Loss Discovered" option for the policy.  Under this option, coverage was expressly excluded for any loss that an insured was aware of prior to the inception date of the policy.  In a section titled "Limits of Liability," the policy stated:

> All loss resulting from a single act or any number of acts of the same Employee or Third Party, and all loss whether such act or acts occurred before or during the Policy Period, will be treated as a single loss and the applicable Limit of Liability set forth in Item 2 of the Crime Declarations will apply, subject to Section X, Liability for Prior Losses.

In addition, the policy provided that if Construction Contractors suffered a loss that was covered under a different insurance policy, Federal Insurance would provided coverage for the

5

loss, subject to the terms and conditions of the policy, "only to the extent of the amount of such loss in excess of the amount recoverable or received under such other" insurance policy.

AlphaCare maintained an insurance policy with Travelers Casualty and Surety Company of America that provided coverage to Construction Contractors for Moon's theft.  In March 2013, Construction Contractors submitted to Travelers a proof of loss for the wire fraud.  Travelers paid Construction Contractors the $500,000 policy limit (minus a $10,000 retention) for that loss.  Then, in August 2013, Construction Contractors submitted to Travelers proof of loss for the check theft, for which Construction Contractors sought coverage as a separate loss.  Travelers refused to treat the check theft as a separate loss because the check theft and wire fraud were part of a single loss caused by Moon.

All told, Moon converted over $1,000,000 in diverted checks as part of the check theft portion of his scheme.  Construction Contractors notified Federal Insurance of a claim under the insurance policy on June 11, 2013.  The proof of loss was submitted on August 29, 2013, and Federal subsequently denied Construction Contractors's claim for indemnity.

### III.  Summary Judgment Standard

Summary judgment is proper where "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party asserting a genuine issue of material fact must support the argument either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The Court views the facts in the record and reasonable inferences that can be drawn from those facts in the light most favorable to the

nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

The Court does not weigh the evidence or determines the truth of any matter in dispute.  *Anderson*

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

The party requesting summary judgment bears an initial burden of demonstrating that no

genuine issue of material fact exists, which the party must discharge by producing evidence to

demonstrate the absence of a genuine issue of material fact or "by showing . . . that there is an

absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett,* 477 U.S.

317, 323–25 (1986) (internal quotation marks omitted).  If the moving party satisfies this burden,

the nonmoving party "may not rest upon its . . . pleadings, but rather must set forth specific facts

showing that there is a genuine issue for trial."  *Moldowan v. City of Warren,* 578 F.3d 351, 374

(6th Cir. 2009) (citing Rule 56 and *Matsushita,* 475 U.S. at 586).  The party opposing the summary

judgment motion must present sufficient probative evidence supporting its claim that disputes over

material facts remain; evidence that is "merely colorable" or "not significantly probative" is

insufficient.  *Anderson,* 477 U.S. at 248–52.

IV.  Discussion

Under Ohio law, insurance policies are contracts, the proper interpretation of which is a

question of law for the court.  *Ramsey v. Allstate Ins. Co.*, 416 F. App'x 516, 520 (6th Cir. 2011)

(citations omitted).  The policy's scope "of coverage is determined by construing the contract in

conformity with the intention of the parties as gathered from the ordinary and commonly

understood meaning of the language employed."  *Id.* (internal quotation marks and citations

omitted).  "When the contract is reasonably susceptible of more than one interpretation, it will be

strictly construed against the insurer and in favor of the insured." *Id*. (internal quotation marks and citation omitted).

The insured bears the burden of proving that a policy covers the claimed loss. *Id*. (citations omitted). If an insurer denies coverage based on a policy exclusion, the insurer bears the burden of demonstrating that the exclusion applies. *Id*. Ohio courts presume that coverage applies unless it is clearly excluded. *Id*. (citation omitted). Ohio has the policy of construing insurance contracts against the insurance company and placing the burden on the company to demonstrate that a policy exception applies. *Id*. at 520–21 (citation omitted).

The policy excludes coverage for "any loss that an Insured is aware of prior to the inception date of this Policy." The undisputed evidence shows that Construction Contractors was aware of the thefts prior to the inception date of the policy. The exact amount of money, however, had yet to be determined.

By the end of 2012, before Construction Contractors sought coverage from Federal Insurance, Construction Contractors was aware that millions of dollars were unaccounted for and that the wire fraud theft accounted for only a portion of the missing money. Specifically, Construction Contractors knew that:  1) it had a negative equity over $2 million dollars; 2) less than $1 million dollars of this shortfall was due to Moon's wire fraud transactions, with Construction Contractors having no explanation regarding the remaining deficit; 3) Moon had falsified Construction Contractor's financial records; 4) Moon had failed to pay Construction Contractor's federal and state taxes and, per the IRS's Notice of Levy, the past-due taxes dated back to 2005; 5) Moon had electronically transferred over $900,000 from Construct Contractor's account to an AlphaCare account, without authorization, between May 2009 and June 2012; and 6)

8

Moon had hidden at least $30,000 in AlphaCare employee healthcare costs in Construction Contractors's expenses.

Construction Contractors attempts to support its position that it is entitled to compensation by asserting that it was unaware of the check thefts until May 2013. Although Construction Contractors admittedly knew of the existence of the loss of funds, the company was unaware of the manner which was used to create the loss. Under Section VII(C) of the policy, however, all losses resulting from a single act or any number of acts by the same employee or third party are to be treated as a single loss.

The undisputed facts establish that a single actor, Moon, was responsible for Construction Contractors's check and wire fraud losses. Therefore, under the policy, Moon's actions are considered as a single loss. *See Dilley, Dewey & Damon, P.C. v. St. Paul Fire & Marine Ins. Co.*, No. 89-1082, 2009 WL 125657, at *2 (6th Cir. Oct. 24, 1989); *Hartman & Tyner, Inc. v. Fed. Ins. Co.*, No. 08-12461, 2009 WL 3152957, at *4 (E.D. Mich. Sept. 28, 2009).

Because Moon's actions are considered as a single loss under the policy, and the policy excludes reimbursement for any losses which Construction Contractors was aware of prior to the inception date of the policy, the policy does not entitle the company to reimbursement. *Hartman & Tyner*, 2009 WL 3152957, at *4. Therefore, Federal Insurance is entitled to summary judgment.

## V.  Conclusion

Accordingly, Federal Insurance's motion for summary judgment (Doc. No. 25) is granted. Construction Contractors's motion for summary judgment (Doc. No. 27) is denied.

IT IS SO ORDERED.

 _S/ David A. Katz_
DAVID A. KATZ
U. S. DISTRICT JUDGE

9